# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DIANA PRICE,**

**Plaintiff,**

**-vs-** **Case No. 6:05-cv-1064-Orl-31KRS**

**CITY OF ORMOND BEACH, FLORIDA & LARRY MATHIESON,**

**Defendants.**

---

# ORDER

This matter comes before the Court on a Motion for Summary Judgment (Doc. 48) filed by the defendants, City of Ormond Beach (the "City") and Larry Mathieson ("Mathieson"),[1] and Plaintiff's Response thereto (Doc. 54).

**I. Background[2]**

Plaintiff, Diana Price ("Price"), was employed by the Ormond Beach Police Department ("OBPD") from May 22, 2000, until November 4, 2005. (Doc. 55-13 at 2). In January 2003, Price became a detective in the Criminal Investigation Division (CID). (Doc. 55-2 at 1). It appears that

---

[1]At all times relevant to this action, Mathieson was the Chief of Police at the Ormond Beach Police Department.

[2]Plaintiff's Response includes a "Statement of Material Facts in Dispute" that does not appear to be in any chronological order, and does not depict all of the facts involved in this case. Instead, Plaintiff's Response attempts to list, albeit in paragraph form, facts favorable to each of its claims in no discernable order. As the facts of this case are complex, and the claims numerous, it was difficult for the Court to piece together a chronological account of the facts alleged by the Plaintiff. However, the Court has done its best to parse out facts that are supported by the record and most favorable to the Plaintiff, in order to construct the following description of events.

Price began having problems in her job as far back as June 2003, when she was first counseled by Sgt. Walker ("Walker") about turning in her Criminal Investigation Reports ("CIRs") late and about the amount of her cell phone bill. (Doc. 55-21 at 1). Price's cell phone bills appeared to be an issue for the rest of 2003, however, Price maintains that all these charges were work related and she paid for all of the overages herself. (Doc. 55-2 at 1). In August 2003, Price was counseled for failing to respond to a subpoena from the State Attorney's office, requiring her to attend a deposition. (Doc. 55-21 at 2). Then, in January 2004, Price was written up by Corporal Millie Doubleday ("Doubleday") for leaving evidence in the jail section. (Doc. 55-21 at 2).

*A) "The DCF Incident"*

The incident that seems to be the starting point for this lawsuit occurred on March 17, 2004. Plaintiff was searching for a robbery suspect and his girlfriend with Detective Elkins ("Elkins"). Price and Elkins went to the girlfriend's mother's house to ask if she had seen either of them. (Price Depo. at 53). The woman said she did not know where they were. (Price Depo. at 53). At the home, were the girlfriend's two children, one age 2 years and one age 6 weeks. (Price Depo. Def. Ex. 1). The woman stated that she had custody of the older child, but not the younger one because he was just born. (Price Depo. at 54). At some point, Plaintiff determined it was necessary to contact the Department of Children and Families ("DCF") because the girl had already abandoned her 1st child and it looked as though she would abandon the second one as well. (Price Depo. at 54). Elkins later accused Price of using DCF to threaten and coerce the woman. (Price Depo. Def. Ex. 1). Elkins states that it was obvious that the children were being well taken care of and did not need DCF. (Price Depo. Def. Ex. 1). Furthermore, Elkins alleged that Price was rude and unprofessional. (Price Depo. Def. Ex. 1). Elkins alleges that he told their

supervisor, Sgt. George Coluccio ("Coluccio"), about Price's behavior as soon as they returned to the police station. (Price Depo. Def. Ex. 1). However, Elkins did not put his concerns in writing until March 23, 2004.[3] (Price Depo. Def. Ex. 1).

Also on March 23, 2004, Price gave Coluccio a letter she wrote complaining about the behavior of other detectives in CID. (Price Depo. Def. Ex. 1). Price states that she wrote this letter on March 17, 2004, however Coluccio refused to accept it from her until the 23rd. (Price Depo. at 59-61). Price states that she tried to hand it to him twice and he told her to hold on to it, finally she sent him an email and he agreed to accept it. (Doc. 55-2 at 2; Price Depo. at 59-61). In her letter, Price complains that there is too much gossiping in the squad and that the other members of CID (all male) are constantly using profanity, demeaning women, talking about her behind her back, and making noises while she is on the phone with victims.[4] (Price Depo. Def. Ex. 1). In reference to the gossip, Price stated "I am not the only female or male Detective that has been treated this way." (Price Depo. Def. Ex. 1). In response to Plaintiff's letter, Mathieson sent an email out to all members of the OBPD on April 14, 2004, reminding all officers that gossip and sexual harassment will not be tolerated. (Price Depo. Def. Ex. 1). Mathieson also required all officers to attend an additional training session dealing with these issues, however, none of the

[3]Mathieson alleges that Elkins filed his written complaint on March 18, 2004 and that a criminal investigation began that day. (Doc. 49-16 at 4-5). However, Elkins' letter, contained in the record, is dated March 23, 2004. (Price Depo. Def. Ex. 1).

[4]Specifically, Price complained of her coworkers using "the words of 'fag', 'fuck him up the ass', 'pussy', making noises of fart sounds, etc.'" (Price Depo. Def. Ex. 1).

officers were interviewed or disciplined in connection with Price's complaints.[5] (Price Depo. Def. Ex. 1). Price admits that after this, the behavior of the CID detectives improved, however, she was then ostracized from the group and the other detectives refused to go out on calls with her. (Price Depo. at 77, 80).

On May 3, 2004, Sgt Kenny Hayes ("Hayes") began an internal investigation into "the DCF incident." (Doc. 49-13 at 2). This investigation was concluded on May 19, 2004, and Hayes determined that Price had in fact acted unprofessionally. (Doc. 49-13 at 5-6). On June 15, 2005, two weeks after a predetermination hearing was held, Price signed a disciplinary action indicating the she would be suspended for 40 hours and transferred from CID to patrol beginning June 27, 2004. (Doc. 49-16 at 6-7). Price then filed a grievance objecting to the suspension and transfer. A grievance hearing was held on July 8, 2004, but Mathieson upheld the disciplinary actions on July 13, 2004. (Doc. 44-16 at 4). On July 24, 2004, Price filed an official complaint with the FCHR, claiming that her suspension and demotion from CID to patrol were acts of retaliation in response to the complaints she made in her letter regarding sexual harassment in the workplace. (Price Depo. Def. Ex. 2). A copy of this complaint was received by Lorenda Volker ("Volker"), the OBPD Human Resources Director, on August 4, 2004. (Price Depo. Def. Ex. 2). Price's suspension and demotion were then reviewed by the City Manager, who, in a letter dated September 13, 2004, upheld the suspension but informed Price that she would be allowed to stay in CID if she agreed to a 90-day probationary period. (Doc. 49-16 at 2-3). Price declined to go

---

[5]Coluccio sent a letter to Price indicating that he would speak with each member of CID to put a stop to the behavior, however, there is no evidence of whether or not he actually did this. (Price Depo. Def. Ex. 1).

back to CID because she feared it would be too easy for OBPD to fire her while on probation. (Price Depo. at 87-89).

*B) The Courtesy Officer Investigation*

On June 23, 2004, another internal investigation of Price began, this time involving unapproved outside employment as a courtesy officer at her apartment complex. (Price Depo. Def. Ex. 3 at 2). This investigation ended on July 23, 2004, and the report indicates that the charges were sustained. (Price Depo. Def. Ex. 3 at 5-7). A predetermination hearing was held regarding these charges on August 12, 2004, and two weeks later Price received an email from Mathieson indicating that her employment as a courtesy officer violated OBPD policy. (Doc. 49-19 at 4). On September 13, 2004 disciplinary notification was issued indicating that Price would receive an 80-hour suspension. Price challenged this disciplinary action, and requested an explanation as to why she was being disciplined when another Officer, Jason Mount ("Mount"), had also worked as a courtesy officer but was not being disciplined. Mathieson sent Price a letter on October 7, 2005, detailing the distinctions between Mount's activities and her own. (Doc. 49-19 at 5). Eventually, on March 10, 2005, Mathieson reduced Price's suspension from 80 hours to 40 hours. (Doc. 49-19 at 2). The City Manager upheld the 40-hour suspension on April 21, 2005. (Doc. 49-19 at 1).

*C) The Car Inspection*

On November 5, 2004, Corporal Corn ("Corn") sent Price an email indicating that he had inspected her patrol car and that it needed to be cleaned because it was in violation of OBPD policy in its current condition. (Doc. 49-23 at 5). In response, Price sent an email to Corn asking why he had inspected her car when Doubleday had already done so, and why the car was inspected without her knowledge or presence. (Doc. 49-23 at 5). She further indicated that her car had

always passed inspection in the past. (Doc. 49-23 at 5). She demanded an explanation as to why pictures were taken of her car and why it had been inspected in the daytime while she was not on duty. (Doc. 49-23 at 5). Corn felt that the tone of her email was sarcastic and unprofessional, and in response he wrote her up for insubordination on November 22, 2004. (Doc. 49-23 at 1).

*D) The Bobbie Rosa E-mail*

On December 21, 2004, Price's roommate, Bobbie Rosa ("Rosa"), sent an email to OBPD listing several complaints, including: (1) that the department was unresponsive to complaints of sexual harassment; (2) that the department tolerated an inappropriate sexual relationship between Victim Advocate Diane Carey ("Carey") and Sgt. George Coluccio ("Coluccio"), which included sexual encounters at work; and (3) that Price was forced to go without a bulletproof vest. (Doc. 49-25 at 2).

This email led to an internal investigation that began on December 23, 2004. (Doc. 49-25 at 2). The investigation was concluded on February 7, 2004, and the affair between Carey and Coluccio was found to have been substantiated. (Doc. 49-25 at 15). Carey was fired from OBPD, however, Coluccio had retired prior to the investigation. (Price Depo. at 163-65). The affair between Carey and Coluccio apparently also became public knowledge and sparked several newspaper articles. (Doc. 55-2 at 3). Price spoke to a reporter for the Daytona Beach News Journal "around this time" in reference to corruption and sexual harassment at OBPD. (Doc. 55-2 at 3). Also, in June 2005, Plaintiff indicates that Mathieson was interviewed on a local radio show, which she called into and contradicted some of his statements. (Doc. 336 at 11; Doc. 55-2 at 3).

*E) "The Nicely Incident"*

On June 13, 2005, Price was asked by Walker and Sgt. Diamond to come into an interrogation room to answer some questions. (Price Depo. at 166-67) Price was not told what they wanted to question her about and refused to speak with them until she had an attorney present. (Price Depo. at 166). At this point, Price was asked for her badge and gun and was put on administrative leave, pending the outcome of a criminal investigation. (Price Depo. at 166). Price was not told what the investigation was about, but later discovered that it involved her friendship with Kevin Nicely ("Nicely"). (Price Depo. at 168-71). Nicely's estranged wife, Kimberly Justice ("Justice"), had made a complaint to the OBPD alleging that Price had used OBPD computers to run background checks on people based on phone numbers Nicely found in Justice's phone. (Doc. 49-33 at 8; Price Depo. at 203-04). Apparently, the numbers belonged to one of Justice's students and his parents. (Doc. 49-33 at 8). Price indicates that she had only run background checks on people she believed to be involved in illegal drug sales, and when she discovered she was wrong she looked no further. (Price Depo. at 203-05). Price did not provide Nicely with any protected information and did not discover anything that she felt needed to be reported to her superiors. (Price. Depo at 204-05). OBPD also accused Price of checking up on a performer at Nicely's Tavern, and ignoring a warrant that was outstanding in Georgia. (Price Depo. at 49-33 at 14). Price did not specifically recall the results of this check, but stated that if there was a warrant, it was non-extraditable and therefore there was nothing she could do. (Price Depo. at 206-07).

Price also learned that she was being investigated for working at Nicely's Tavern, a bar in Daytona Beach owned by Nicely. OBPD has a policy against outside employment without prior approval, and Florida law forbids law enforcement officers from accepting outside employment in

the "beverage business.". (Doc. 49-33 at 18). Price admits that she helped Nicely out at the bar once in a while by unlocking the doors when he was away or signing for deliveries. (Price Depo. at 197). However, she maintains that she never received any pay for helping out and did not consider it employment. (Price Depo. at 197). She did admit that she would sometimes eat at the bar with Nicely for free, but she also did not see this as compensation. (Price Depo. at 201). She never served alcohol to any customers. (Price Depo. at 200-01).

On September 28, 2005, Mathieson received a letter from Assistant State Attorney ("ASA") Craig indicating his refusal to prosecute Price for misuse of OBPD computers. (Doc. 49-35 at 1-2). ASA Craig indicated that, because Price had not divulged any confidential information and had legitimate reasons for looking up the background information, criminal charges would be inappropriate. (Doc. 49-35 at 2). On October 3, 2005 Mathieson wrote a letter to State Attorney John Tanner criticizing ASA Craig's handling of the situation and arguing that criminal charges should be brought against Price, both for using OBPD computers and for working in a bar. (Doc. 49-35 at 3-4).

On October 7, 2005, the internal investigation into the Nicely incident was completed and the charges against Price were sustained. (Doc. 49-33 at 16-18). A predetermination hearing was scheduled for October 27, 2005. (Doc. 49-36 at 8). As a result of this hearing, Price was fired from OBPD on November 4, 2005. (Doc. 49-36 at 4). On November 11, 2005, Hayes sent a letter to the Florida Department of Law Enforcement ("FDLE") explaining why Price was fired, and indicating that even though the ASA had refused to bring criminal charges, he felt it was his duty to notify FDLE of the situation. (Doc. 49-36 at 1).

*F) Price's Employment Evaluations*

The record contains two employee evaluations for Price. The first one was signed on July 12, 2004, and gives Price an overall rating of 3.0 out of 5.0, indicating that she "meets the standards." (Doc. 49-11). Price signed the evaluation, but disputed the validity of the lower scores. (Doc. 49-11 at 7). The second evaluation was done on May 21, 2005. (Doc. 49-32). Again Price is found to "meet the standards." (Doc. 49-32 at 7). However, Mathieson refused to sign the evaluation indicating that he felt Price's performance fell below department standards. (Doc. 49-32 at 1).

**II. Standard of Review**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgement points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who

fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Environmental Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

**III. Legal Analysis**

*A) Counts I and II: 42 U.S.C. § 1983*

Counts I and II are brought solely against Mathieson, under 42 U.S.C. § 1983 ("§ 1983") for violations of Price's constitutional rights under the 1st and 14th amendments. Mathieson argues that he is entitled to qualified immunity with respect to both claims under § 1983. In order to receive qualified immunity, "the government official must first prove that he was acting within [the scope of] his discretionary authority." *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003). Once a defendant establishes that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate by showing: (1) that the defendant violated the plaintiff's constitutional rights, and (2) that the right violated was clearly established. *Id.*

In this case, Mathieson's decisions with regard to Price's employment were clearly discretionary and Price does not dispute that. However, Plaintiff has not made any attempt to refute Mathieson's claim of qualified immunity. As the burden is on the Plaintiff to establish that qualified immunity is inappropriate, Plaintiff's failure to respond to this argument is fatal to her claims. Therefore, Mathieson is entitled to summary judgment on Counts I and II.

*B) Counts IV and V: Title VII*

Counts IV and V are brought solely against the City under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). In Count IV, Plaintiff alleges discrimination based on her gender. To establish a *prima facie* case of employment discrimination under Title VII, the Plaintiff must meet the *McDonnell Douglas* test[6] by showing: "(1) that she is a member of a protected class, (2) that she is entitled to or qualified for the position, (3) that she suffered an adverse employment action, and (4) that she was treated less favorably than similarly situated employees who are not members of her protected class." *Hanley v. Sports Authority,* 143 F.Supp.2d 1351, 1355-6 (S.D. Fla. 2000) (citing *Holifield v. Reno,* 115 F.3d 1555 (11th Cir. 1997)).[7]

---

[6]*See McDonnell Douglas Corp v. Green,* 411 U.S. 792 (1973).

[7]In termination cases the elements are slightly different:

> Absent direct evidence of discrimination, a plaintiff in a termination case establishes a prima facie case by showing (1) that she is a member of a protected class, (2) that she was qualified for the position held, (3) that she was terminated, and (4) that she was replaced by a person outside the protected class.

*Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1073 (11th Cir. 1995).

It is undisputed that Price is a member of a protected class because she is female. Based on the evidence, Plaintiff has established at least a question of fact as to whether or not she was qualified for her position. Additionally, Plaintiff has shown sufficient evidence of adverse employment actions because she was suspended twice, transferred from CID to patrol, put on administrative leave and ultimately terminated.[8]

Plaintiff claims that she was discriminated against in four contexts: (1) being disciplined for the DCF incident, (2) the inspection of her patrol car by Sgt. Corn, (3) being disciplined for working as a courtesy officer at her apartment complex, and (4) being disciplined for helping out at Nicely's bar.

Plaintiff has not shown any male officers who were similarly situated with regard to the DCF incident or the car inspection incident. (Price Depo. at 91, 141). Instead, Plaintiff simply lists other instances in which she feels that men in the department received more favorable treatment than the women. (Price Depo. at 90-96). However, Plaintiff was not involved in any of those incidents and none of them are remotely similar to the incidents in this case. Also, it is undisputed that when Price was transferred out of CID, she was replaced by another female officer. With regard to the incident involving working at the bar, the only "similarly situated" employee that Plaintiff point to is another female officer, who obviously is not outside her protected class. (Price

[8]The Court cannot say, as a matter of law, that Price's transfer from CID to patrol was an adverse employment action because her salary was not reduced and it was not considered a "demotion." It is also unclear whether being put on administrative leave with pay is an adverse employment action. However, these are questions of fact for a jury to decide, and must be resolved in Plaintiff's favor at this stage.

Depo. at 211). With regard to her termination claim, Price has shown no evidence that she was replaced by a male.

However, Plaintiff does indicate that, while she was disciplined for working for her apartment complex as a courtesy officer, other male officers, particularly Officers Mount and Zimmerer, were doing the same thing and were not disciplined. The record contains letters from management at two apartment complexes that indicate that Mount and Zimmerer were both receiving discounted rents for performing the same or similar duties as Price. (Doc. 49-20 at 27-28). Therefore, Plaintiff has established a prima facie case with regard to the 40-hour suspension she received for acting as a courtesy officer at her apartment complex.

Establishment of a *prima facie* case of discrimination creates a rebuttable presumption of discrimination in favor of the plaintiff. The burden of production then shifts to the defendant "to articulate some legitimate nondiscriminatory reason" for the employer's actions. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996). Once the defendant has offered a nondiscriminatory explanation for its decision, the presumption of illegal discrimination is destroyed. The burden then falls on the plaintiff to show that the employer's explanations are merely pretextual. *See McDonnell,* 411 U.S. at 804.

> The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or *indirectly by showing that the employer's proffered explanation is unworthy of credence.*

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981) (emphasis added).

Plaintiff is not required to produce evidence of specific acts or statements showing discriminatory intent on the part of the employer. *See Combs v. Plantation Patterns, Meadowcraft, Inc.,* 106 F.3d 1519, 1538. (1997) "A plaintiff in a discrimination case based on circumstantial evidence can avoid judgment as a matter of law by putting on a *prima facie* case and by producing evidence sufficient to discredit in the mind of a reasonable juror all of the defendant's proffered nondiscriminatory reasons for its actions." *Id*.

Defendants claim that Mount[9] was treated differently for several reasons: (1) he did not perform any security related duties at the apartment complexes, but instead only received discounted rent for parking his patrol car there, (2) he was living within his own jurisdiction and (3) he did not offer his City pager or cell phone for use in publications given to residents. (Doc. 49-19 at 5, 16-17). However, the letters presented by Plaintiff indicate that Mount and Price worked at the same apartment complexes under the same arrangements and create at least a question of fact as to whether the City's explanations are pre-textual.[10] Therefore, the City is not entitled to summary judgment on Count IV, and Plaintiff may proceed on this claim with regard to her second 40-hour suspension.

Finally, in Count V, Price alleges that she was retaliated against for complaining about the discrimination she suffered. In order to maintain a claim for retaliation under Title VII, a plaintiff

---

[9]Officer Zimmerer was no longer employed at OBPD when Price was disciplined and there is no evidence that the department was even aware of his position as a courtesy officer while he was still employed by OBPD. Therefore, he cannot be considered similarly situated to Price.

[10]Plaintiff also cites to the "Hayes Depo." in support of her argument on this matter, however nothing matching that description can be found in the record.

must allege that "(1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities." *Gregory v. Georgia Dept. Of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004).

Plaintiff claims that she was retaliated against for complaining about sexual harassment and filing a charge of discrimination and retaliation with the FCHR (Doc. 54 at 6).[11]

Price has presented sufficient evidence of all three elements under retaliation. First, it is undisputed that filing a claim of discrimination with the EEOC and/or the FCHR is a protected activity under Title VII. Second, Price alleges that her suspensions, transfer out of CID, administrative leave and termination were all adverse employment actions that were the result of retaliation. Finally, there is a question of fact as to whether causation can be shown. Plaintiff's complaint to the FCHR was signed on July 24, 2004 – after Plaintiff was suspended for 40 hours and transferred back to patrol. Plaintiff, however, alleges that she informed OBPD that she had phoned in a complaint to the FCHR before any disciplinary action was taken against her. (Price Depo. at 102-03). It will be up to a jury to decide when OBPD first became aware of Plaintiff's complaint to the FCHR. However, it is undisputed that her FCHR claim was filed prior to her second 40-hour suspension, her being placed on administrative leave and her termination. While the Defendants have offered several explanations as to why Plaintiff was disciplined and ultimately terminated, the Court cannot determine the credibility of these explanations as a matter

[11]There are many references in the record to the filing of an EEOC claim, however there is no EEOC complaint in the record, and no definitive testimony as to when it was filed. Therefore, for purposes of this Order, the Court references only the FCHR complaint.

of law. Therefore, it appears that there are material questions of fact remaining regarding Plaintiff's retaliation claim and summary judgment is not appropriate with regard to Count V.[12]

**IV. Conclusion**

Accordingly, it is

**ORDERED** that Defendants' Motion for Summary Judgment (Doc. 48) is **GRANTED** in part and **DENIED** in part. The Clerk shall enter a judgment in favor of Defendant Mathieson.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on December 19, 2006.

**GREGORY A. PRESNELL**
**UNITED STATES DISTRICT JUDGE**

Copies furnished to:

Counsel of Record
Unrepresented Party

---

[12]There is some indication that Plaintiff alleges retaliation in violation of Title VII for submitting her March 23, 2004 letter complaining about the behavior of her male coworkers in CID. However, Price made clear in that letter that the behavior was directed toward both men and women and was thus unrelated to her membership in a protected class. Therefore, submitting that letter does not qualify as a "protected activity" under Title VII.